1  **SHEPPARD, MULLIN, RICHTER & HAMPTON** LLP
     A Limited Liability Partnership
2    Including Professional Corporations
   THOMAS R. KAUFMAN, Cal. Bar No. 177936
3  1901 Avenue of the Stars, Suite 1600
   Los Angeles, California 90067-6055
4  Telephone:  310.228.3700
   Facsimile:  310.228.3701
5  E mail        tkaufman@sheppardmullin.com

6

7  **CHAMBERLAIN HRDLICKA**
   **WHITE WILLIAMS & AUGHTRY**
8
   Annette A. Idalski (application *pro hac vice* pending)
9  191 Peachtree Street, N.E., 46th floor
   Atlanta, GA  30303-1747
10 Telephone:  (404) 658-5386
   Annette.Idalski@chamberlainlaw.com
11

12
   *Counsel for Petitioner Halliburton Energy Services, Inc.*
13

14               UNITED STATES DISTRICT COURT

15              CENTRAL DISTRICT OF CALIFORNIA

16 | HALLIBURTON ENERGY | Case No. |
   | SERVICES, INC, | |
17 | | |
   | | **PETITIONER HALLIBURTON** |
18 | Petitioner, | **ENERGY SERVICES INC.'S** |
   | | **CONSENT PETITION TO CONFIRM** |
19 | v. | **FINAL ARBITRATION AWARD** |
   | | **AND FOR ENTRY OF JUDGMENT** |
20 | DONALD STENNETT, an individual, | |
   | | **[9 U.S.C. § 9]** |
21 | Respondent. | |

22

23

24

25

26

27

28

1    This action seeks to confirm an Award of Arbitration awarding judgment in
2  favor of Halliburton Energy Services, Inc. ("Halliburton") and awarding nothing on
3  respondent Donald Stennett's claims. Pursuant to the Federal Arbitration Act,
4  codified at 9 U.S.C. § 1 *et seq*. (the "FAA"), Halliburton alleges as follows for its
5  *Petition to Confirm Arbitration Award* against Stennett, who **consents to the filing**
6  **of this Petition and the relief it seeks**.

7                              **JURISDICTION AND VENUE**

8    1.    This Court has subject matter jurisdiction over this action pursuant 28
9  U.S. Code § 1332. Stennett sought damages in excess of $75,000.00 and is a citizen
10  of the state of California. Halliburton is a corporation incorporated within the state
11  of Delaware with its principal office and place of business being Harris County,
12  Texas.

13    2.    Personal jurisdiction over Stennett is proper because he is a resident of
14  California.

15    3.    Venue is proper in the Central District of California pursuant to 9
16  U.S.C. § 9 because this application is "made to the United States court in and for the
17  district within which such award was made."

18                                 **THE PARTIES**

19    4.    Halliburton is a corporation incorporated within the state of Delaware
20  with its principal office and principal place of business being Harris County, Texas.
21  At all material times, Halliburton maintained an office in the state of California.

22    5.    At all times mentioned herein, Stennett was, and is, an individual
23  residing in the state of California.

24    6.    Stennett was represented by counsel located in Ventura, California for
25  purposes of the underlying arbitration.

26                **THE ARBITRATION PROCEEDING AND AWARD**

27    7.    At all material times, Stennett was employed as a directional driller
28  ("DD") for Halliburton.

-1-

8.     As a condition of his employment at Halliburton, Stennett signed a Binding Arbitration Agreement (the "Arbitration Agreement").  Paragraph 4A of the Agreement requires that "All disputes not otherwise settled by the Parties shall be finally and conclusively resolved through arbitration. . . ."  Paragraph 4B of the Agreement requires that "Each dispute shall be arbitrated on an individual basis. . . ."  Pursuant to Paragraph 8A, the FAA applies to all proceedings under the Agreement.  A true and correct copy of the Agreement is attached hereto as Exhibit A.

9.     Stennett filed his initial Demand for Arbitration on or around March 28, 2018.  The operative pleadings at the time of the arbitration were Stennett's First Amended Complaint, filed on or around March 20, 2019, and Halliburton's Amended Answer to Plaintiff's Arbitration Complaint, filed on or around April 11, 2019.  In the arbitration, Stennett asserted causes of action for failure to pay minimum wage, failure to pay overtime compensation, failure to provide meal and rest periods, failure to furnish accurate itemized wage statements, waiting time penalties, and unfair business practices pursuant to the Fair Labor Standards Act, California Labor Code and California Business and Professions Code.  Halliburton denied all of Stennett's claims and allegations, and asserted numerous defenses, including, but not limited to, that Stennett released his claims against Halliburton.

10.     The Judicial Arbitration and Mediation Services, Inc. ("JAMS") appointed the Hon. Steven J. Stone, Presiding Justice, California Court of Appeal (Ret.) as arbitrator (the "Arbitrator").

11.     Counsel for Stennett, Palay & Hefelfinger APC, were given proper notice of the arbitration hearing scheduled for February 25, 2020, and appeared at the hearing.

12.     Counsel for Halliburton, Annette A. Idalski and Kyle D. Winnick of Chamberlain Hrdlicka White Williams & Aughtry, represented Respondent Halliburton.

13.	At the hearing, both parties presented oral and documentary evidence, which was received by the Arbitrator.

14.	On February 25, 2020, based on the documents and testimony presented at the hearing, and the governing provisions of Arbitration Agreement, the Arbitrator issued a Findings of Fact, Conclusions of Law and Award (the "Award"). A true and correct copy of the Award is attached hereto as Exhibit B.

15.	In the Award, which is well-reasoned and comprehensive, the Arbitrator found that Stennett duly and validly released all claims asserted against Halliburton, and the Arbitrator found in favor of Halliburton on all claims asserted by Stennett.

16.	By stipulation dated July 21, 2020, the Parties agreed that they consent to having the Award confirmed by a court of competent jurisdiction and that there are no grounds upon which to vacate the Award.  A true and correct copy of this stipulation is attached hereto as Exhibit C.

## MEMORANDUM OF POINTS AND AUTHORITIES

17.	"A motion to confirm an arbitration award is intended to be a summary proceeding that merely makes the arbitrators' award a final, enforceable judgment of the court." *Hellmich v. Mastiff Contracting, LLC*, 2015 WL 391989, at *5 (C.D. Cal. Jan. 27, 2015).

18.	"[E]very presumption favors the arbitrator's award, and the merits of the award, either on question of law or fact, are generally not subject to review." *Thibodeau v. Crum*, 4 Cal. App. 4th 749, 760 (1992) (quoting *Lehto v. Underground Constr. Co.*, 69 Cal. App. 3d 933, 939 (1977)).

19.	The FAA provides that "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed'" by the FAA. *Central Montana Rail v. BNSF Ry. Co.*, 422 F. App'x 636, 637 (9th Cir. 2011) (citing *Hall St. Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008)).

20.     There are no grounds for vacating, modifying, or correcting the Award. Indeed, Stennt consents to the confirmation of the Award by this Court. *See* Exh. C.

21.     Even if Stennett's consent to confirmation is not dispositive, the standard of review of arbitral awards is exceedingly narrow.   Under the FAA, confirmation is required "even in the face of erroneous findings of fact or misinterpretations of law."   *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 640 (9th Cir. 2010).

22.     As the United States Supreme Court has explained:

> the provision for judicial confirmation of an arbitrator's award contained in § 9 carries **no hint of flexibility**. On application for an order confirming the arbitration award, the court "**must grant**" the order "unless the award is vacated, modified, or correct as prescribed in sections 10 and 11 of this title." There is **nothing malleable** about "must grant," which unequivocally tells courts to grant confirmation in all cases, except when one of the "prescribed" exceptions applies.

*Hall St. Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 587 (2008) (emphasis added).

23.     When requested to confirm an arbitration award, "[c]ourts are not authorized to review the arbitrator's decision on the merits," even if the losing party alleges that the decision was in error. *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (citing *United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). "If an 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Id*. (quoting *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)). "[E]ven 'serious error' on the arbitrator's part does not justify overturning his decision, where . . . he is construing a contract and acting within the scope of his authority." *Id*. at 510. (quoting *Misco*, 484 U.S. at 38).

"'[C]ourts . . . have no business weighing the merits of the grievance [or] considering whether there is equity in a particular claim.'" *Id.*

24.     Therefore, because it is ripe for confirmation, and because there is no basis for vacating or modifying the Award, this Court, respectfully, should issue an order confirming the Final Award pursuant to 9 U.S.C. § 9, and enter judgment consistent with same.

## CLAIM FOR RELIEF

1.     Halliburton repeats and re-alleges the allegations in paragraphs 1 through 23 above.

2.     Pursuant to the FAA, Halliburton is entitled to a judgment entered by this Court to confirm the Award in favor of Petitioner.

3.     The Award is final and binding on the Parties pursuant to the Binding Arbitration Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Halliburton respectfully requests that this Court issue a judgment in its favor:

(a)     Confirming and entering judgment on the Award; and

(b)     Providing such other and further relief as may be requested.

Dated: August 18, 2020

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


By        /s/ Thomas R. Kaufman
          THOMAS R. KAUFMAN

          Attorneys for Petitioner
          HALLIBURTON ENERGY SERVICES, INC

EXHIBIT A

# PLAN AND RULES



the road to resolution

# plan
# and rules

866.99RESOLVE

**PLAN AND RULES**

Este folleto contiene información importante sobre
su empleo. Cada empleado debe leerlo y familiari-
zarse con su contenido. Para obtener una versión de
este documento en español, llámenos al 281.575.4500
ó 866.997.3765.

PLAN AND RULES

# The Halliburton
# Dispute Resolution Plan and Rules

## 1. Purpose and Construction

The Plan is designed to provide a program for the quick, fair, accessible and inexpensive resolution of all Disputes, as defined hereafter, between the Company and the Company's present and former Employees and Applicants for employment, including those related to or arising out of a current, former or potential employment relationship with the Company. The Plan is intended to create an exclusive procedural mechanism for the final resolution of all Disputes falling within its terms. It is not intended either to abridge or enlarge substantive rights available under applicable law. The Plan is a contract but does not modify the "at will" relationship between the Company and its Employees. The Plan should be interpreted in accordance with these purposes.

## 2. Definitions

Unless the context clearly indicates the contrary, capitalized terms used herein shall have the meaning ascribed to them in the DRP, or, if not defined therein, the meaning ascribed below:

A.  "AAA" means the American Arbitration Association.

B.  "JAMS" means Judicial Arbitration and Mediation Services.

C.  The "Act" means the Federal Arbitration Act, 9 U.S.C. § 1, et seq., as amended from time to time.

D.  "Company" means Sponsor and every subsidiary (first tier and downstream) of Sponsor, any Electing Entity, any entity or person alleged to have joint and several liability concerning any Dispute, and all of their directors, officers, employees and agents, every plan of benefits, whether or not tax-exempt, established or maintained by any such entity, the fiduciaries, agents and employees of all such plans, and the

*1*

successors and assigns of all such entities,
plans and persons; provided, however, that
in the case of an Electing Entity, "Company"
shall include the Electing Entity only to
the extent provided in the Electing Entity's
agreement to be bound by the Plan.

E.   "Dispute" means all legal and equitable
claims, demands, and controversies, of
whatever nature or kind, whether in contract,
tort, under statute or regulation, or some
other law, between persons bound by the Plan
or by an agreement to resolve Disputes under
the Plan, or between a person bound by the
Plan and a person or entity otherwise entitled
to its benefits, including, but not limited to,
any matters with respect to:

1.  This Plan;

2.  The employment or potential
    re-employment of an Employee, including
    the terms, conditions or termination of
    such employment with the Company;

3.  Employee benefits or incidents of
    employment with the Company;

4.  Any other matter related to or concerning
    the relationship between the Employee
    and the Company including, by way
    of example and without limitation,
    allegations of discrimination based on
    race, sex, religion, national origin, age,
    veteran status or disability; sexual or other
    kinds of harassment; wrongful discharge;
    worker's compensation retaliation;
    defamation; infliction of emotional
    distress; failure to pay wages; or status,
    claim or membership with regard to any
    employee benefit plan;

5.  An Applicant's application for
    employment and the Company's actions
    and decisions regarding such application;

6.  Any prior resolution or settlement of a
    Dispute between Parties subject to the
    Plan; and

**PLAN AND RULES**

    7. Any personal injury or death allegedly incurred in or about a Company workplace or on Company time.

F. "Dispute" includes all such matters regardless of when the events on which they are based occurred, including matters based on events occurring before the Employee became subject to this Plan (so long as such Disputes were not previously asserted in a judicial forum) or after termination of the employment relationship.

G. "Electing Entity" means any legal entity which has agreed to be bound by the Plan as provided herein.

H. "Employee" means any person who is or has been in the employment of the Company on or after the effective date of this Plan, whether or not employed at the time a claim is brought with respect to a Dispute, residing in the United States, or otherwise subject to the laws of the United States or any state, municipality or other political subdivision of the United States.

I. "Applicant" means any person who is seeking or has sought employment with the Company after the effective date of this Plan.

J. "Party" means, with respect to a particular Dispute, affected persons and/or entities bound by this Plan.

K. "Plan" means this Halliburton Dispute Resolution Plan, as amended from time to time.

L. "Rules" means the Halliburton Dispute Resolution Rules, as amended from time to time, which are applicable to mediation and arbitration.

M. "Sponsor" means The Halliburton Company, a Delaware Corporation.

### 3. Name, Application and Coverage

A. The Plan shall be referred to as the "Halliburton Dispute Resolution Plan."

3

# PLAN AND RULES

Alternatively, it may be referred to as the "Halliburton Dispute Resolution Program" or the "Dispute Resolution Program."

B. Until revoked by Sponsor pursuant to this Plan, this Plan applies to and binds the Company, each Employee and Applicant and the estate, heirs, beneficiaries and assigns of any such person or entity; provided, however, that this Plan shall not apply to any Employee in a unit of Employees represented by a labor organization, or to the Company with respect to such Employees, except to the extent permitted in an applicable collective bargaining agreement or lawfully imposed by the Company when no collective bargaining agreement is in effect.

C. This Program inures to the benefit of, and is intended to be for the benefit of the Company's clients, customers, contractors and vendors, who are intended third-party beneficiaries of this Dispute Resolution Plan. The mandatory arbitration provisions of this Plan shall be applicable to all Disputes between Employees and the Company's clients, customers, contractors and vendors, who shall have the right to enforce those provisions of the Plan.

D. Except as provided for herein, this Plan applies to any Dispute.

E. Notwithstanding anything to the contrary in this Plan, the Plan does not apply to claims for worker's compensation benefits, unemployment compensation benefits, or any other claim that, as a matter of law, cannot be arbitrated.

F. Mediation and arbitration are only available for Disputes involving legally protected rights.

G. Notwithstanding any other provision hereof, any court with jurisdiction over the Parties may issue any injunctive orders (including

**PLAN AND RULES**

preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met, pending the institution or completion of proceedings under the Plan.

## 4. Resolution of Disputes

A.  All Disputes not otherwise settled by the Parties shall be finally and conclusively resolved through arbitration under this Plan and the Rules, instead of through trial before a court.

B.  (i) Each Dispute shall be arbitrated on an individual basis. Neither the Company nor any Employee or Applicant may pursue any Dispute on a class action, collective action or consolidated basis or in a representative capacity on behalf of other persons or entities who are claimed to be similarly situated, or participate as a class member in such a proceeding. The arbitrator in any proceeding under this Plan shall have no authority to conduct the matter as a consolidated, class or collective action.

(ii) If the procedural limitation in subparagraph B(i) of this section is held unenforceable by a court in a proceeding in which a party seeks to pursue a class or collective action or otherwise act in a representative capacity, then this Plan shall not apply with respect to that class or representative action which shall proceed instead before the court. If the court, however, ultimately denies the party's request to proceed on a class, collective or representative basis, then the party's individual claim(s) shall be subject to this Plan and referable to arbitration pursuant to its terms.

## 5. Confidentiality and Non-Retaliation

A.  The Dispute Resolution Program ("Program"), its Administrator, any subordinate administrators, the staff of the Program and any other person conducting

PLAN AND RULES

conferences or serving as an impartial Third Party on behalf of the Program in any in-house Dispute Resolution process conducted under the auspices of the Program, will hold matters reported under the Program and related communications in confidence, in keeping with the Standards of Practice and the Code of Ethics of the International Ombudsman Association. The Code of Ethics and the Standards of Practice of the International Ombudsman Association are incorporated into this Plan by reference and appended.

For purposes of requests by or subpoenas from any Party that the Plan Administrator or any subordinate administrators, or any member of the staff of the Program or person conducting conferences or serving as an impartial third party on behalf of the Program in any in-house Dispute Resolution process conducted under the auspices of the Program, provide testimony in any internal or external investigation, administrative hearing, or arbitration or litigation proceeding, the confidentiality standards described in this section attach to the Dispute Resolution Program, rather than any individual disputant. This means that only the Program, rather than any individual disputant, may waive confidentiality, and the Program may only waive confidentiality, even upon request or subpoena by a disputant, under circumstances consistent with the Code of Ethics and Standards of Practice of the International Ombudsman Association.

B.  No Employee shall be subject to any form of discipline or retaliation with respect to terms and conditions of employment for initiating or participating in good faith in any process or proceeding under this Plan.

## 6. Amendment

A.  This Plan may be amended by Sponsor at any time by giving at least 30 days' notice to current Employees. However, no amendment

shall apply to a Dispute that arose prior to the effective date of the amendment.

B.  Sponsor may amend the Rules at any time by serving notice of the amendments on AAA and JAMS. However, no amendment of the Rules shall apply to a Dispute that arose prior to the effective date of the amendment.

## 7. Termination

This Plan may be terminated by the Sponsor at any time by giving at least 30 days' notice of termination to current Employees. However, termination shall not be effective as to Disputes that arose prior to the effective date of termination.

## 8. Applicable Law

A.  The Act shall apply to this Plan, the Rules and any proceedings under the Plan or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Plan or the Rules. The applicability of the Act (i) shall not depend on a determination that the relationship between an Employee or Applicant and the Company involves commerce and (ii) shall not be affected by a determination that any exemption or exclusionary provision of the Act (including that concerning foreign or interstate transportation workers) applies to such relationship.

B.  The substantive legal rights, remedies and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all relief, legal or equitable, including punitive damages, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in the proceeding.

C.  The Plan shall not be construed to grant additional substantive, legal, or contractual rights, remedies or defenses which would not be applied by a court of competent

**PLAN AND RULES**

jurisdiction in the absence of the Plan unless expressly authorized by these provisions.

D.  Notwithstanding the provisions of the preceding subsection, in any proceeding before an arbitrator, the arbitrator, in the arbitrator's discretion, may allow a prevailing Employee or Applicant reasonable attorney's fees, expert witness' fees, and other costs which may be allowable under the Federal Rules of Civil Procedure as part of the award. The discretion to allow an award of fees under this subsection is in addition to any discretion, right or power which the arbitrator may have under applicable law. However, any award of fees shall be reduced by any amounts which have been or will be paid by the Halliburton Employee Legal Consultation Plan.

## 9.  Administrative Proceedings

A.  This Plan does not limit any person's right to file an administrative complaint or charge with, or to participate in the investigation of an administrative complaint or charge by, any governmental agency (e.g., this Plan does not limit a person's right to file a charge with the Equal Employment Opportunity Commission or National Labor Relations Board).

B.  Participation in any administrative or judicial proceeding by the Company shall not affect the applicability of the Plan to any such Dispute during or upon termination of the administrative or judicial proceedings. A finding, recommendation or decision by an administrative body on the merits of a Dispute shall have the same legal weight or effect under the Plan as it would in a court of competent jurisdiction.

## 10. Exclusive Remedy

Proceedings under the Plan, including arbitration, shall be the exclusive, final and binding method by which Disputes are resolved.

**PLAN AND RULES**

## 11. Electing Entities

A. Corporations or other legal entities, not otherwise Parties, may elect to be bound by this Plan by written agreement with Sponsor.

B. Election may be made only as to some types of Disputes, or only as to some persons, in the discretion of Electing Entity.

## 12. Effective Date

The original effective date of this Plan was June 15, 1993. Its effective date as amended shall be thirty (30) days following notice of the most recent amendments to current employees.

## 13. Severability

The terms of this Plan and the Rules are severable. The invalidity or unenforceability of any provision herein shall not affect the application of any other provision. Where possible, consistent with the purposes of the Plan, any otherwise invalid provision of the Plan or the Rules may be reformed and, as reformed, enforced.

## 14. Administration

Sponsor shall appoint one or more persons to administer the Plan who shall be known as the "Dispute Resolution Plan Administrator." The Dispute Resolution Plan Administrator shall be responsible for the management and administration of the Plan.

## 15. Assent

Employment or continued employment after the Effective Date of this Plan constitutes consent by both the Employee and the Company to be bound by this Plan, both during the employment and after termination of employment. Submission of an application, regardless of form, for employment constitutes consent by both the Applicant and the Company to be bound by this Plan.

PLAN AND RULES

# HALLIBURTON DISPUTE RESOLUTION RULES

### 1. Definitions

All definitions included in the Halliburton Dispute Resolution Plan apply to these Rules.

### 2. Application

A. If different rules are applicable to a specific class of Disputes, and have been adopted by Sponsor and served on AAA or JAMS, these Rules shall not apply to such class of Disputes.

B. These Rules apply in the form existing at the time proceedings are initiated under them.

C. To the extent consistent with these Rules, the Employment Dispute Resolution Rules of AAA or JAMS, and the Federal Rules of Civil Procedure, also apply to all proceedings governed by these Rules.

### 3. Initiation of the Process

A. A Party may initiate proceedings under these Rules at any time, subject to any defenses including those applicable to the timeliness of the claim, including limitations and laches.

B. While either Party to a Dispute shall have the right to initiate arbitration proceedings, the Party seeking monetary or other affirmative relief shall have the obligation to do so for all purposes, including limitations and laches.

C. A Party may initiate proceedings by serving a written request to initiate proceedings on AAA or JAMS and tendering the appropriate administrative fee.

D. Copies of the request shall be served on all other Parties to the Dispute by AAA or JAMS. The request shall describe the nature of the Dispute, all causes of action asserted, a

brief description of the factual basis for each such cause of action, the amount involved, if any, the remedy sought, and the proceeding locale requested.

E. Proceedings may also be initiated by an Employee or Applicant by serving a written request to initiate proceedings to the Company's Dispute Resolution Plan Administrator. In such a case, the Plan Administrator shall forward any properly served request it has received to AAA or JAMS.

F. Parties against whom a claim is asserted shall file an answering statement within 21 days of receiving notice of intent to arbitrate or a specification of claims, which shall include any counterclaims.

## 4. Appointment of Arbitrator

Immediately after payment of the arbitration fee, the Case Manager of AAA or JAMS shall simultaneously send each Party an identical list of at least five (5) names of persons chosen from a panel of qualified arbitrators which AAA or JAMS shall select and maintain and who have been prescreened by the Case Manager for subject matter knowledge and conflicts of interest. The Parties to the Dispute shall have ten (10) calendar days from the transmittal to strike any names objected to, number the remaining names, if any, in order of preference and return the list to the Case Manager. From the persons who have been approved by all Parties, and in accordance with the order of mutual preference, AAA or JAMS shall invite the arbitrator to serve.

If the Parties' selections did not result in a mutually agreeable arbitrator, the Case Manager shall provide each Party with a second list of at least five (5) arbitrator candidates. Within ten (10) calendar days of transmittal of the second strike list, each Party may strike two (2) names, and shall rank the remaining candidates in order of preference. If there is more than one candidate remaining after the Parties strike, the candidate with the highest total ranking by the Parties will become the arbitrator.

## PLAN AND RULES

Any ties will be resolved in the favor of the non-Company Party.

At any time during the selection process, the Parties may mutually agree to the appointment of an arbitrator from the lists provided by AAA or JAMS.

### 5.  Qualifications of the Arbitrator

No person shall serve as an arbitrator in any matter in which that person has any financial or personal interest in the result of the proceeding. No person shall serve as an arbitrator unless he or she is a licensed attorney. Prior to accepting appointment, the prospective arbitrator shall disclose any circumstance likely to prevent a prompt hearing or create a presumption of bias. Upon receipt of such information from the arbitrator or any other source, AAA or JAMS will either disqualify that person or communicate the information to the Parties for comment. Thereafter, AAA or JAMS may disqualify that person, and its decision shall be conclusive.

### 6.  Vacancies

If a vacancy occurs for any reason (including because of disqualification pursuant to Rule 6 above) or if an appointed arbitrator is unable to serve promptly, the appointment procedure in Section 5 shall apply to the selection of a substitute arbitrator.

### 7.  Date, Time and Place of Hearings

A.  The arbitrator shall set the date, time and place of any proceeding.

B.  Notice of any hearing shall be given at least ten (10) calendar days in advance, unless the arbitrator determines or the Parties agree that a shorter time is necessary.

C.  The arbitrator may consider, short of imposing undue expense on the Company, accommodation of the Employee or Applicant in the selection of a proceeding location.

### 8.  Conferences

At the request of AAA or JAMS or of a Party or on

**PLAN AND RULES**

the initiative of the arbitrator, the arbitrator or AAA or JAMS may notice and hold conferences for the discussion and determination of any matter which will expedite the proceeding, including:

A.  Venue

B.  Clarification of issues

C.  Determination of preliminary issues, including summary determination of dispositive legal issues

D.  Summary (i.e., prehearing) determination, upon written motion of either Party and after opportunity for response by the nonmoving Party, of legal issues that dispose of the entire Dispute or any aspect of the Dispute

E.  Discovery

F.  The time and location of proceedings or conferences

G.  Interim legal or equitable relief authorized by applicable law

H.  Pre- or post-hearing memoranda

I.  Stipulations and/or

J.  Any other matter of substance or procedure.

## 9.  Mode of Hearings and Conferences

In the discretion of the arbitrator or by agreement of the Parties, conferences and hearings may be conducted by telephone or by written submission, as well as in person.

## 10. Pre-Hearing Discovery

A.  On any schedule determined by the arbitrator, each Party shall submit, in advance, the names and addresses of the witnesses it intends to produce and any documents it intends to present.

B.  The arbitrator shall have discretion to determine the form, amount and frequency of discovery by the Parties.

*13*

**PLAN AND RULES**

    C.   Discovery may take any form permitted by the Federal Rules of Civil Procedure, as amended from time to time, subject to any restrictions imposed by the arbitrator.

## 11. Representation

Any Party may be represented by counsel or by any other authorized representative.

## 12. Attendance at Hearings

The arbitrator shall maintain the privacy of the proceedings to the extent permitted by law. Any person having a direct interest in the matter is entitled to attend the proceedings.

The arbitrator shall otherwise have the power to exclude any witness, other than a Party or other essential person, during the testimony of any other witness. The arbitrator shall determine whether any other person may attend the proceeding. Upon the request of any Party, the arbitrator shall exclude any witness during the testimony of any other witness.

## 13. Postponement

    A.   The arbitrator, for good cause shown by a Party, or on agreement of the Parties, shall postpone any proceeding or conference.

    B.   The pendency of court proceedings related to the same matter is not good cause for postponement.

## 14. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if required by law or requested by any Party, shall do so.

## 15. Record of Proceedings

Unless otherwise agreed by the parties or ordered by the arbitrator, a record of the hearing on the merits of a Dispute shall be prepared at the expense of the Company which shall furnish a copy to the

PLAN AND RULES

other Parties upon request and the payment of the reasonable cost of reproduction.

## 16. Procedure

The proceedings shall be conducted by the arbitrator in whatever order and manner will most expeditiously permit full presentation of the evidence and arguments of the Parties.

## 17. Arbitration in the Absence of a Party

The arbitrator may proceed in the absence of Parties or representatives who, after due notice, fail to be present or fail to obtain a postponement. An award shall not be made solely on the default of a Party. The arbitrator shall require any Party who is present to submit such evidence as the arbitrator may require for the making of an award.

## 18. Evidence

A.  The arbitrator shall be the sole judge of the relevancy, materiality and admissibility of evidence offered. Strict conformity to legal rules of evidence shall not be necessary.

B.  The arbitrator may subpoena witnesses or documents at the request of a Party or on the arbitrator's own initiative.

C.  The arbitrator may consider the evidence of witnesses by affidavit or declaration, but shall give it only such weight as the arbitrator deems appropriate after consideration of any objection made to its admission.

## 19. Post-Hearing Submissions

All documentary evidence to be considered by the arbitrator shall be filed at the hearing unless the arbitrator finds good cause to permit a post-hearing submission. All Parties shall be afforded an opportunity to examine and comment on any post-hearing evidence. The arbitrator shall permit the filing of post-hearing briefs at the request of a Party and shall determine the procedure and timing of such filings.

**PLAN AND RULES**

## 20. Closing and Reopening of Proceedings

A.  When the arbitrator is satisfied that the record is complete, including the submission of any post-hearing briefs or documents permitted by the arbitrator, the arbitrator shall declare the proceeding closed.

B.  The proceeding may be reopened on the arbitrator's initiative or upon application of a Party at any time before the award is made.

## 21. Waiver of Procedures

Any Party who fails to object in writing, after knowledge that any provision or requirements of these procedures and Rules have not been complied with, shall be deemed to have waived the right to object.

## 22. Service of Notices and Papers

Any papers, notices, or process necessary or proper for the initiation or continuation of any proceeding under these Rules (including the award of the arbitrator, any court action in connection therewith, or the entry of judgment on an award made under these procedures) may be served on a Party by mail addressed to the Party or his or her representative at the last known address or by personal service. AAA or JAMS, the Parties and the arbitrator may also use facsimile transmission, e-mail or other written forms of electronic communication to give any notices required by these Rules.

## 23. Communications with AAA or JAMS and the Company

A.  Any Party may notice, serve or communicate with AAA by contacting:

**American Arbitration Association**
13727 Noel Rd., Dallas, TX 75240
Phone: (972) 774-6958 or (800) 804-8865
Electronic Fax: (855) 267-4082 or
(972) 490-9008

B.  Any Party may notice, serve or communicate with JAMS by contacting:

**PLAN AND RULES**

JAMS
8401 North Central Expressway, Suite 610
Dallas, TX 75225
Phone: (214) 744-5267 or (800) 352-5267
Fax: (214) 720-6010

C.  Any Party may notice, serve or communicate
with the Company by contacting:

**Dispute Resolution Program Administrator**
**The Halliburton Company**
3000 N Sam Houston Pkwy E, K138
Houston, TX 77032
(281) 575-4500 or 1.866.99RESOLVE
Fax: (281) 575-4525

The DRP does not represent the Company,
however, it will serve as a point of contact to
submit official communications.

## 24. Communication with the Arbitrator

There shall be no communication between the
Parties and the arbitrator other than at any oral
hearings or conferences. Any other oral or written
communications from the Parties to the arbitrator
shall be directed to AAA or JAMS (and copied to the
Parties) for transmission to the arbitrator, unless the
Parties and the arbitrator agree otherwise.

## 25. Time of Award

The award shall be promptly made by the arbitrator,
unless otherwise agreed by the Parties or specified by
applicable law, no later than thirty (30) calendar days
from the date of the closing of the proceeding or, if
applicable, the closing of a reopened proceeding.

## 26. Form of Award

The award shall be in writing and shall be signed
by the arbitrator. The arbitrator shall write a brief
statement of the essential findings of fact and
conclusions of law on which the award is based. The
award shall be executed in any manner required by
applicable law.

**PLAN AND RULES**

### 27. Modification of Award

On order of a court of competent jurisdiction, or on agreement of the Parties, the arbitrator shall modify any award. The arbitrator may modify an award on the motion of a Party if the arbitrator finds that the award, as rendered, is ambiguous or defective in form, or if the award requires an illegal or impossible act. These are the only circumstances under which an arbitrator shall have jurisdiction to withdraw or modify an award.

### 28. Settlement

If the Parties settle their Dispute during the course of the arbitration, the arbitrator may set out the terms of the settlement in a consent award.

### 29. Scope of Arbitrator's Authority

The arbitrator's authority shall be limited to the resolution of legal Disputes between the Parties. As such, the arbitrator shall be bound by and shall apply applicable law including that related to the allocation of the burden of proof as well as substantive law. The arbitrator shall not have the authority either to abridge or enlarge substantive rights available under applicable law. The arbitrator may also grant emergency or temporary relief which is or would be authorized by applicable law. The arbitrator shall be bound by and shall comply with the provisions of the Plan and Rules.

### 30. Judicial Proceedings and Exclusion of Liability

A. Neither AAA or JAMS nor any arbitrator is a necessary Party in any judicial proceedings relating to proceedings under these Rules.

B. Neither AAA or JAMS nor any arbitrator shall be liable to any Party for any act or omission in connection with any proceedings within the scope of these Rules.

C. Any court with jurisdiction over the Parties may compel a Party to proceed under these Rules at any place and may enforce any award made.

## PLAN AND RULES

D. Parties to these Rules shall be deemed to have consented that judgment upon the award of the arbitrator may be entered and enforced in any federal or state court having jurisdiction over the Parties.

E. Initiation of, participation in, or removal of a legal proceeding shall not constitute waiver of the right to proceed under these Rules.

F. Any court with jurisdiction over the Parties may issue any injunctive orders (including preliminary injunctions) if the necessary legal and equitable requirements under applicable law are met pending the institution of proceedings under these Rules.

### 31. Fees and Expenses

A. The expenses of witnesses shall be borne by the Party producing such witnesses, except as otherwise provided by law or in the award of the arbitrator.

B. All attorney's fees shall be borne by the Party incurring them except as otherwise provided by law, by the Plan or in the award of the arbitrator.

C. Discovery costs (e.g., court reporter fees for original transcripts) shall be borne by the Party initiating the discovery. The cost of copies of deposition transcripts or other discovery shall be borne by the Party ordering the copy except as otherwise provided by law or in the award of the arbitrator.

D. The fees and expenses of experts, consultants and others retained or consulted by a Party shall be borne by the Party utilizing those services, except as otherwise provided by law, by the Plan, or in the award of the arbitrator.

E. The Employee or Applicant shall pay a $50 fee if he or she initiates arbitration or mediation. Otherwise, Employee/Applicant Parties shall not be responsible for payment of fees and expenses of proceedings under

## PLAN AND RULES

these Rules including required travel of an arbitrator or a mediator, expenses of an arbitrator, mediator, AAA, or JAMS, and the cost of any proof produced at the discretion of an arbitrator.

F.  If the demand for mediation or arbitration is initiated by the Company, such fees will be paid by the Company.

G.  Except as otherwise provided by law or in the award of the arbitrator, all other expenses, fees and costs of proceedings under these Rules shall be borne equally by the Parties who are not Employees/Applicants.

## 32. Interpretation and Application of These Rules

The arbitrator shall interpret and apply these Rules insofar as they relate to the arbitrator's powers and duties. All other rules shall be interpreted and applied by AAA or JAMS.

## 33. Applicable Law

A.  Proceedings under these Rules and any judicial review of awards shall be governed by the Act.

B.  Except where otherwise expressly provided in these Rules, the substantive law applied shall be state or federal substantive law which would be applied by a United States District Court sitting at the place of the proceeding.

## 34. Statute of Limitations

A.  In the event that the Employee does not file a discrimination charge or other claim with an appropriate administrative agency prior to initiating arbitration, arbitration must be initiated within the applicable deadline for filing an administrative charge or claim in the state where the employee is located.  Failure to do so will bar the claim.

B.  If a Party initiates judicial proceedings rather than proceedings under the Program within the time allowed by applicable law for the

**PLAN AND RULES**

filing of a judicial complaint and thereafter agrees or is ordered by the court to submit the Dispute to arbitration under the Program, the Party must initiate arbitration, in conformance with the Rules, within 60 days of entry of the court's order or the disposition of any immediate appeal of such order, or the time allowed by applicable law for the filing of a judicial complaint, whichever is longer. Failure to do so will bar the claim.

C.   If a Party files a request for mediation within the time allowed by applicable law for the filing of a judicial complaint, the Party must initiate arbitration, in conformance with the Rules, within 90 days of the conclusion of the mediation or the time allowed under the applicable statute of limitations, whichever is longer.  Failure to do so will bar the claim.

## 35. Mediation

At any time before the proceeding is closed, the Parties may agree to mediate their Dispute by notifying AAA or JAMS. AAA or JAMS shall determine what procedures apply to any such mediation.

# APPENDIX

## INTERNATIONAL OMBUDSMAN ASSOCIATION

## CODE OF ETHICS

### Independence

The Ombuds is independent in structure, function, and appearance to the highest degree possible within the organization.

### Neutrality and Impartiality

The Ombuds, as a designated neutral, remains unaligned and impartial. The Ombuds does not engage in any situation which could create a conflict of interest.

### Confidentiality

The Ombuds holds all communications with those seeking assistance in strict confidence, and does not disclose confidential communications unless given permission to do so. The only exception to this privilege of confidentiality is where there appears to be imminent risk of serious harm.

### Informality

The Ombuds, as an informal resource, does not participate in any formal adjudicative or administrative procedure related to concerns brought to his/her attention.

© *International Ombudsman Association*
*Reprinted by permission of the International Ombudsman Association*

**PLAN AND RULES**

## INTERNATIONAL OMBUDSMAN ASSOCIATION

## STANDARDS OF PRACTICE

### February 2006

**Independence**

1.1 The Ombuds Office and the Ombuds are
    independent from other organizational
    entities.

1.2 The Ombuds holds no other position within
    the organization which might compromise
    independence.

1.3 The Ombuds exercises sole discretion
    over whether or how to act regarding an
    individual's concern, a trend or concerns
    of multiple individuals over time. The
    Ombuds may also initiate action on a concern
    identified through the Ombuds' direct
    observation.

1.4 The Ombuds has access to all information
    and all individuals in the organization, as
    permitted by law.

1.5 The Ombuds has authority to select Ombuds
    Office staff and manage Ombuds Office
    budget and operations.

**Neutrality and Impartiality**

2.1 The Ombuds is neutral, impartial, and
    unaligned.

2.2 The Ombuds strives for impartiality, fairness
    and objectivity in the treatment of people
    and the consideration of issues. The Ombuds
    advocates for fair and equitably administered
    processes and does not advocate on behalf of
    any individual within the organization.

2.3 The Ombuds is a designated neutral
    reporting to the highest possible level of the
    organization and operating independent
    of ordinary line and staff structures. The
    Ombuds should not report to nor be

structurally affiliated with any compliance function of the organization.

2.4 The Ombuds serves in no additional role within the organization which would compromise the Ombuds' neutrality. The Ombuds should not be aligned with any formal or informal associations within the organization in a way that might create actual or perceived conflicts of interest for the Ombuds. The Ombuds should have no personal interest or stake in, and incur no gain or loss from, the outcome of an issue.

2.5 The Ombuds has a responsibility to consider the legitimate concerns and interests of all individuals affected by the matter under consideration.

2.6 The Ombuds helps develop a range of responsible options to resolve problems and facilitate discussion to identify the best options.

## Confidentiality

3.1 The Ombuds holds all communications with those seeking assistance in strict confidence and takes all reasonable steps to safeguard confidentiality, including the following: The Ombuds does not disclose confidential communications unless given permission to do so in the course of informal discussions with the Ombuds, and even then at the sole discretion of the Ombuds; the Ombuds does not reveal, and must not be required to reveal, the identity of any individual contacting the Ombuds Office, nor does the Ombuds reveal information provided in confidence that could lead to the identification of any individual contacting the Ombuds Office, without that individual's express permission; the Ombuds takes specific action related to an individual's issue only with the individual's express permission and only to the extent permitted, unless such action can be taken in a way that safeguards the identity of the individual contacting the Ombuds Office.

The only exception to this privilege of confidentiality is where there appears to be imminent risk of serious harm, and where there is no other reasonable option. Whether this risk exists is a determination to be made by the Ombuds.

3.2 Communications between the Ombuds and others (made while the Ombuds is serving in that capacity) are considered privileged. The privilege belongs to the Ombuds and the Ombuds Office, rather than to any party to an issue. Others cannot waive this privilege.

3.3 The Ombuds does not testify in any formal process inside the organization and resists testifying in any formal process outside of the organization, even if given permission or requested to do so.

3.4 If the Ombuds pursues an issue systemically (e.g., provides feedback on trends, issues, policies and practices) the Ombuds does so in a way that safeguards the identity of individuals.

3.5 The Ombuds keeps no records containing identifying information on behalf of the organization.

3.6 The Ombuds maintains information (e.g., notes, phone messages, appointment calendars) in a secure location and manner, protected from inspection by others (including management), and has a consistent and standard practice for the destruction of such information.

3.7 The Ombuds prepares any data and/ or reports in a manner that protects confidentiality.

3.8 Communications made to the Ombuds are not notice to the organization. The Ombuds neither acts as agent for, nor accepts notice on behalf of, the organization. However, the Ombuds may refer individuals to the appropriate place where formal notice can be made.

## PLAN AND RULES

### Informality and Other Standards

4.1 The Ombuds functions on an informal basis by such means as: listening, providing and receiving information, identifying and reframing issues, developing a range of responsible options, and – with permission and at the Ombuds discretion – engaging in informal third-party intervention. When possible, the Ombuds helps people develop new ways to solve problems themselves.

4.2 The Ombuds as an informal and off-the-record resource pursues resolution of concerns and looks into procedural irregularities and/or broader systemic problems when appropriate.

4.3 The Ombuds does not make binding decisions, mandate policies, or formally adjudicate issues for the organization.

4.4 The Ombuds supplements, but does not replace, any formal channels. Use of the Ombuds Office is voluntary, and is not a required step in any grievance process or organizational policy.

4.5 The Ombuds does not participate in any formal investigative or adjudicative procedures. Formal investigations should be conducted by others. When a formal investigation is requested, the Ombuds refers individuals to the appropriate offices or individual.

4.6 The Ombuds identifies trends, issues and concerns about policies and procedures, including potential future issues and concerns, without breaching confidentiality or anonymity, and provides recommendations for responsibly addressing them.

4.7 The Ombuds acts in accordance with the IOA Code of Ethics and Standards of Practice, keeps professionally current by pursuing continuing education, and provides

opportunities for staff to pursue professional training.

4.8 The Ombuds endeavors to be worthy of the trust placed in the Ombuds Office.

*Reprinted by permission of the International Ombudsman Association*

**PLAN AND RULES**

Este folleto contiene información importante
sobre su empleo. Cada empleado debe leerlo y
familiarizarse con su contenido. Para obtener una
versión de este documento en español, llámenos al
281.575.4500 ó 866.997.3765.

**HALLIBURTON**

H08094   11/14
© 2014 Halliburton

All Rights Reserved

Printed in U.S.A.

EXHIBIT B

**HON. STEVEN J. STONE**
Presiding Justice, Court of Appeal (Ret.)
JAMS
555 W. 5th Street
32nd Floor
Los Angeles, CA 90013
Tel: 213-620-1133
Fax: 213-620-0100

**ARBITRATOR**

## JAMS ARBITRATION

DONALD STENNETT, an individual,

Claimant,

JAMS Ref No: 1220058651

vs.

HALLIBURTON ENERGY SERVICES,
INC., a Delaware corporation,

Respondent.

**FINDINGS OF FACT, CONCLUSIONS
OF LAW AND AWARD**

**Arbitration**
**Date: February 25, 2020**
**Time: 10:00 AM**

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND AWARD

Having considered all of the evidence introduced at the First Phase of the Hearings, as to the validity
and effect of the release, on February 25, 2020, along with all of the subsequent arguments and written
filings of counsel, and based upon the entire record in this matter, the Arbitrator makes the following
findings and conclusions and award. Any finding of fact that may properly be construed as a conclusion
of law shall be so construed, and vice versa.

### I. FINDINGS OF FACT

### A. Halliburton's Reduction-in-Force Procedure

Halliburton first hired Stennett in 2001. In March 2016, as part of a reduction-in-force (the "RIF") occasioned by a downturn in the industry, Stennett was laid off, as were other employees (the "March 2016 RIF"). Halliburton's Human Resources ("HR") personnel were trained to follow established guidelines when handling RIF meetings during the March 2016 RIF. Halliburton regional management set these guidelines. Pursuant to Halliburton's guidelines, employees are informed of the layoff in a meeting with their manager and at least one HR representative. Laid off employees are offered severance based on years of service.

However, such employees may only receive severance worth four or more weeks of pay on condition that they sign and execute a settlement and release agreement. According to the Halliburton Company Business Practice Severance – US document: "In exchange for and as a condition of receiving a severance benefit that consists of four or more weeks of Benefit Base Pay, employees must sign a release and waiver of claims related to their employment with the Company." Halliburton has never paid severance worth four or more weeks of pay to someone who did not sign a release agreement. Laid off employees may forgo their severance by refusing to sign a release agreement. For employees age 40 or older, their release agreements have sections germane to the Older Workers Benefit Protection Act, which are read to them at the RIF meeting. Halliburton also has employees age 40 or older initial the portions of the release read to them at the RIF Meeting. If employees, who are subject to the RIF, have a question about the legal scope of the release agreement, HR personnel suggest to them that they seek legal counsel or initiate a claim with Halliburton's Dispute Resolution Program.

As explained by Jason Merritt ("Merritt"), who in March 2016 was a Senior HR Operations Partner for Halliburton, this is so "because from an HR standpoint, we are not employed to provide legal guidance. And when we review the release and separation . . . there's a section in there that we read to them directly in the meeting that advises them to contact an attorney."

**B. Stennett Received The Release Agreement On March 23, 2016, Was Told To Consult An Attorney Before Signing It, And Was Given 45 Days (Until May 7, 2016) To Consider Signing It.**

Stennett began contemplating filing a potential claim for overtime and unpaid wages in 2015. On March 23, 2016, during a meeting with Coordinator Kaleb Bean, Office Manager Annette Terri, and HR representative Donna Martin, Stennett was told he was being laid off (the "RIF 3 Meeting"). Merritt was not present for the RIF Meeting. During the RIF Meeting, Stennett was presented with a Separation, General Release, and Settlement Agreement (the "Release"). During the RIF Meeting, Stennett testified that the HR representatives (Terri and Martin) told him that he could not "sue Halliburton" if he signed the Release.

The following provisions of the Release were read aloud to Stennett during the RIF Meeting by Martin:

> a. In return for this Agreement, Release and Settlement, Employee will receive consideration beyond that which Employee was already entitled to receive before entering into this Agreement, Release and Settlement;
> b. Employee was given a copy of this Agreement, Release and Settlement on March 23, 2016, and Employee has forty-five (45) days to review it before accepting; and
> c. Employee is hereby advised in writing by Employer to consult with an attorney before signing this Agreement, Release and Settlement.

Stennett knew he had forty-five (45) days to consider signing the Release—that is, until May 7, 2016 (the "Consideration Period"). Stennett was also told that he had seven (7) days to revoke the Release after signing it. Accordingly, prior to signing the Release, Stennett had an opportunity to independently investigate whether doing so would affect the claims for overtime he was considering filing against Halliburton. Though Stennett alleges that he was "already in [the] process of filing" an overtime claim at the time of the RIF Meeting, he did not ask anyone at the RIF Meeting if signing the Release would preclude his overtime claims. He merely told HR that he needed time to "think about" signing the Release.

## C. Stennett's Testimony That Merritt Told Him That The Release Would Not Affect His Wage Claims Is Insufficient.

3

After the RIF Meeting, and consistent with Halliburton's suggestion that he seek the advice of legal counsel regarding the Release, Stennett tried contacting at least two attorneys to ascertain if signing the Release would bar his legal claims for overtime. Stennett filed a declaration with the Arbitrator swearing under oath that "[i]n April of 2016, I also tried to contact roughly two attorneys" to ascertain the legal effect of signing the Release. At the Hearing, however, Stennett changed his testimony as to the date he contacted these attorneys, now swearing that he contacted counsel in March 2016—presumably, as discussed below, because his phone records showed that he called Merritt in March 2016, not April 2016. This contradiction weighs negatively in my view of Stennett's overall credibility as a witness. Regardless, Stennett knew before signing the Release that it could potentially bar his present claims. Indeed, at some point, Stennett also spoke with a co-worker named Preston Epps who told him (Stennett) that he (Epps) "decided to waive" signing the release and, instead, chose to file a "full claim"—presumably, a wage-and-hour claim; thus, further underscoring for Stennett that the release could bar his wage claims and not signing was a viable option. Sometime before signing the Release, Stennett managed to speak with one attorney, but this attorney could not answer whether the Release would bar his wage claims because he was an "accident" attorney.

Around the time Stennett tried contacting attorneys, and even though he admitted that the HR representatives told him that the Release would bar his claims, he also called "the office" to "ask the same question," but Annette Terri referred him to Merritt. Stennett placed several calls to Merritt's office line, and spoke with him for less than three minutes on March 31, 2016 (the "Phone Call"). Stennett originally testified to the Arbitrator that the Phone Call occurred in late-April 2016. However, authentic phone records introduced as evidence showed that the Phone Call in fact occurred on March 31, 2016. It is unclear whether the Phone Call with Merritt occurred after or before Stennett spoke with the accident attorney. Stennett originally testified he spoke with the accident attorney after speaking with Merritt. However, Stennett subsequently testified that he spoke to the accident attorney before speaking with Merritt. This contradiction in Stennett's sworn testimony weighs negatively in my evaluation of his overall credibility as a witness. The Parties dispute the contents of the phone call between Merritt and Stennett.[1] Stennett claims that although he could not remember the specifics of what was discussed, he "got the answer that [he] wanted": namely, that the Release would not bar his wage claims. Stennett knew, at the time of the phone call, that Merritt was not an attorney.

---

[1] As discussed below, it does not matter what was said on this call or whether it even occurred.

4

Stennett's wife, Elsa, submitted to the Arbitrator a declaration averring that she merely "observed" Stennett on the phone with a person she guessed was Jason Merritt. During the Hearing, however, Ms. Stennett vacillated between claiming that she did not hear what Merritt was saying on the Phone Call, to claiming that Stennett spoke with Merritt on speakerphone (a fact omitted in her declaration and in Mr. Stennett's testimony and declaration), to claiming that she did not "know who [Stennett] was dealing with, or what." Ms. Stennett was unable to explain why in her declaration she merely averred that she "observed" her husband on the phone allegedly with Merritt, even though she now testified that she heard the conversation on speakerphone. The contradictions in Ms. Stennett's sworn testimony reflect negatively on her overall credibility as a witness. Because of their contradictory testimony, and even if a lack of memory is the cause, I find Stennett and Ms. Stennett to lack sufficient credibility concerning their testimony about the Phone Call with Merritt.

Merritt's testimony was consistent, inherently logical, and, therefore, believable. Merritt has no legal training or training in interpreting contracts. Merritt testified the he did not ever opine to any Halliburton employee about what a contract means. Merritt testified, without contradiction, that starting in 2013, he has been involved in approximately 1,000 layoff meetings and never once opined on the legal scope of a release because he is "not a lawyer, and that's following the guidance that was provided to us from [an] HR standpoint. Consistent with this, although Merritt had no memory of speaking with Stennett, he testified that had Stennett asked him about the legal scope of the release, he (Merritt) "would have followed the same guidance to advise him to contact an attorney," as he had done with 20 to 30 other employees who asked a legal question concerning the release.

## D. Stennett Signed The Release Well Before The Expiration Of The 45-Day Consideration Period Without Obtaining Legal Advice or Reading The Release In Its Entirety.

### 1. Stennett Executed the Release Before Obtaining Legal Advice.

5

It is undisputed that Stennett signed the Release sometime in April 2016. Stennett's "guesstimate" is that he signed the Release a few days after the Phone Call with Merritt. Regardless of which version of Stennett's sworn testimony is considered as to the date Stennett signed the Release (whether it was early-April or late-April), Stennett still signed the Release before the 45-day expiration period, which ended on May 7, 2016. Stennett spoke with one attorney about the effect of the Release, but that attorney did not render an opinion. A second attorney returned Stennett's phone call sometime after Stennett executed the Release; however, because he had already signed the Release, Stennett did not bother returning this second attorney's phone call to learn his opinion on the scope of the Release. In short, Stennett still had several weeks to follow-up with the second attorney before returning the signed Release to Halliburton, but chose not to.

## 2. Stennett Admitted At The Hearing That The Release Covered His Wage Claims, But He Did Not Read This Language In Its Entirety Before He Signed It.

By signing the Release, Stennett released Halliburton "from any and all claims . . . whether now known or unknown . . . including . . . any claim for . . . salary or wages; and all claims or causes of action arising from [his] employment" or "termination of employment" with Halliburton. Stennett further agreed in the Release that he was not otherwise entitled to the severance. Exhibit 1 to the Release reads as follows:

> As a consequence of the termination of your employment with Halliburton, you are eligible to receive severance benefits. To receive those benefits, you must sign the SEPARATION, GENERAL RELEASE AND SETTLEMENT AGREEMENT you have been provided within forty-five (45) days of receiving it . . .

The Release further provides that the "consideration paid is to compromise doubtful and disputed claims. . ." By executing the Release, Stennett acknowledged that he did so of his "own free will, after having a reasonable period of time to review, study and deliberate regarding its meaning and effect, and after being advised to consult with an attorney, and without reliance on any representation of any kind or character not expressly set forth herein." The Release also contains an integration clause specifying that it constituted the entire agreement between Stennett and Halliburton: "This instrument

6

constitutes the entire agreement and understanding concerning Employee's employment, separation from the same, and the other subject matters addressed herein between the parties, and supersedes and replaces all prior negotiations and all agreements proposed or otherwise, whether written or oral. . .".

Before signing the Release, Stennett read the Release, at least in part, and understood that its import was that he could not bring a lawsuit against Halliburton. ("I didn't read it entirely, because I knew it had to do with a lawsuit."). For example, Stennett admitted that he did not read fully read Paragraph 7 (the language specifying which claims are released), nor the language in Paragraph 7 stating that he is releasing his claims relating to "salary or wages."

## II.    CONCLUSIONS OF LAW

It is undisputed that Stennett executed the Release and he received valuable consideration for doing so. Therefore, Stennett—not Halliburton—has the burden to establish some ground to avoid the preclusive effect of the Release's plain terms.

## A.    The Release is Fully Enforceable Under California And Federal Law, Thus Barring Stennett's Claims in this Arbitration.

California law strongly favors the settlement of disputes and the enforcement of releases.

Settlement agreements are highly favored as productive of peace and goodwill in the community, and reducing the expense and persistency of litigation.

Accordingly, the general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents and is estopped from saying that its provisions are contrary to his intentions or understandings.

Here, the Release could not be plainer: in exchange for receiving \$28,350, Stennett released Halliburton "from any and all claims . . . whether now known or unknown . . . including . . . any claim for . . . salary or wages; and all claims or causes of action arising from [his] employment" or "termination of employment" with Halliburton. The Release's broad language and specific reference to

7

"salary or wages" and "all claims arising from [Stennett's] employment [with Halliburton]" clearly bar Stennett's claims, because they all stem from his employment with Halliburton and concern salary or wages. That the Release does not specifically mention the Cal. Labor Code or FLSA is immaterial. The Release executed by Stennett bars all of his claims.

## 1. Section 206.5 of the California Labor Code Further Supports the Release's Validity.

Stennett's contention that Cal. Labor Code § 206.5 renders the Release unenforceable as to his state wage-and-hour claims is misguided. California's strong policy favoring settlement of disputes and enforcing general releases is fully supported by Cal. Labor Code §§ 206 and 206.5, which expressly permit the release of wage claims under the Cal. Labor Code.

These sections provide, in pertinent part:

In case of a dispute over wages, the employer shall pay, without condition . . . all wages, or parts thereof, **conceded by the [employer] to be due**, leaving the employee all remedies he might otherwise be entitled to as to any balance claimed.

Cal. Lab. Code § 206(a) (emphasis added).

An employer shall not require the execution of a release of a claim or right on account of wages due, or to become **due**, or made as an advance on wages to be earned, unless payment of those wages has been made. A release required or executed in violation of the provisions of this section shall be null and void as between the employer and the employee.

Cal. Lab. Code § 206.5(a) (emphasis added).

Reading these sections together, California courts have uniformly held that Section 206.5(a) "simply prohibits employers from coercing settlements by withholding wages concededly due." Section 206.5(a) establishes two kinds of wage claims: (a) claims for wages conceded by the employer to be due

8

and (b) all others. Unless a claim falls within the narrow category of wages that are "concededly due," Section 206.5 does not apply and the release is fully enforceable. The consideration Stennett received for signing the Release was not "concededly due."

Halliburton does not concede that Stennett was misclassified as exempt, and it disputes his claim that he was entitled to additional compensation for any work he performed for Halliburton. Stennett cannot claim that Halliburton conceded that additional wages were due to him before he executed the Release.

A review of the Release further confirms that Stennett was not forced to sign the Release in order to receive wages that were concededly due. Stennett expressly averred that he was "not otherwise . . . entitled" to the $28,350.00 he received for executing the Release and agreeing to be bound by its terms.

The very document that Stennett relies on to contend that he as otherwise entitled to the severance clearly states the opposite: "In exchange for and as a condition of receiving a severance benefit that consists of four or more weeks of Benefit Base Pay, employees must sign a release and waiver of claims . . ."

This is the typical situation where an employee agreed to release certain claims in exchange for severance benefits not otherwise earned.

## 2. Private Settlements of Bona Fide FLSA Disputes Are Enforceable.

Stennett's contention that private resolutions of FLSA disputes are unenforceable as a matter of law is likewise misguided. Bona fide FLSA disputes may be settled without court or Department of Labor supervision, especially if the settlement occurred pre-litigation (as here). There is such a bona fide dispute here.

Not only did the Arbitrator deny Stennett's Motion for Summary Judgment, which alone shows that there are genuine material issues of fact for trial (i.e., a bona fide dispute), but Stennett expressly averred in the Release that the consideration he received was paid to compromise doubtful and disputed claims.

9

In sum, there is a bona fide dispute between the parties, rendering Stennett's release of his FLSA claims fully enforceable, and no authority compels a contrary conclusion.

Nowhere in the text of the current or prior versions of the FLSA is there a command that FLSA actions cannot be settled or otherwise dismissed without approval from a court. Accordingly, Stennett's contention that the Release does not cover his wage claims because the Release carves out claims that cannot be released as a matter of law misses the mark: No law renders Stennett's release of his wage claim unenforceable.

## B. The Arbitrator Cannot, As a Matter Of Law, Consider Stennett's Proffered Evidence that Merritt Made Promises to Him at Variance with the Release.

Stennett contends that even if the Release is enforceable under the Cal. Labor Code and FLSA (it is), the alleged statement by Merritt obviated the terms in the Release barring his wage claims. As described above, Stennett's version of the Phone Call is not credible. By contrast, Merritt's testimony that he would have responded to Stennett's question the same way he had been trained and done dozens of times before with other employees—by telling Stennett that he could not give legal advice and telling Stennett to consult his own lawyer—is very credible. That ends this matter because Stennett has no proof to carry his burden of establishing a ground to avoid the Release. Because the Release that Stennett executed—and received consideration for—contains an integration clause, his case hinges entirely on irrelevant evidence. It further explicitly releases Halliburton from any "wage or salary" claims, known or unknown, that Stennett may or may not have had at the time of execution. To circumvent the legal import of this language, Stennett contends that an oral promise altered the Release to mean his wage claims are not covered. But because this alleged oral promise directly contradicts the unambiguous terms of the Release, evidence of it is irrelevant under the PER—in other words, it has no probative value.

Even if Stennett was credible, this is immaterial because Merritt's alleged statement is at variance with the unambiguous terms of the Release.

## C. Even if the Parol Evidence Rule Did Not Bar Evidence Of Merritt's Alleged Statement, And Even If Stennett Did Not Ratify The Release, Stennett Still Cannot Establish Fraud Or Mistake.

Even assuming arguendo that the PER did not preclude Stennett's contentions, and even assuming arguendo that Stennett's "fast and loose" conduct did not amount to a ratification of all the terms of the Release, the Release is still fully enforceable because no evidence supports his claims of (1) fraud or (2) mistake.

### 1.   Stennett Failed to Prove Fraud.

To prove fraud, Stennett has the burden to establish: (1) a false misrepresentation; (2) knowledge of falsity (scienter); (3) intent to defraud or to induce plaintiff to enter into a contract; (4) justifiable reliance; and (5) resulting damage. In California, something more than nonperformance is required to prove the defendant's intent not to perform his promise.

In effect, Stennett is claiming that Merritt, a non-lawyer with no legal training, orally promised him that Halliburton would not enforce the Release against any wage claims he may bring in the future, only to rescind on that promise by asserting the Release as a defense in this arbitration. But merely failing to keep a promise is insufficient as a matter of law to establish fraudulent intent. The rule makes good sense in this case: Merritt had no legal training, a fact that Stennett knew at the time he spoke to Merritt; thus, Merritt was not in a position to know the legal scope of the Release—and, therefore, could not have had the requisite scienter.

Moreover, Stennett failed to prove justifiable reliance for two principal reasons (assuming Merritt's alleged statement was even made). First, it was unreasonable for Stennett to rely on purported legal advice given to him by a non-lawyer. As California courts have repeatedly held: a legal opinion by a layman cannot constitute the basis of recovery for fraud. Stennett could not, as a matter of law, claim fraudulent inducement (or mistake) because the alleged misrepresentation concerned the legal effect of the release.

11

Jason Merritt is not a lawyer—a fact Stennett knew when he allegedly spoke with him. It was therefore unreasonable, as a matter of law, for Stennett to rely on Merritt's alleged statement (assuming it was even made).

Stennett was given 45 days to consider signing the Release and told to seek the advice of an attorney. Halliburton did not hinder him from doing so. Stennett did seek legal counsel, he just decided to sign the Release before waiting for an attorney to return his phone call. He cannot now claim that he relied on a third-party's representation. Accordingly, even if the fraud exception to the PER applied in this case, Stennett cannot, as a matter of law, prove fraud.

## 2.   Stennett Failed to Prove Unilateral Mistake.

Stennett's final contention is that the Release should be avoided because of his unilateral mistake of law as to the scope of the Release, due to Merritt's alleged statement. This fails for the simple reason that it is undisputed that Stennett failed to fully read the Release. In California, there is a general duty to read a contract one signs. Stennett utterly failed this duty: he did not read the Release "entirely," only "somewhat," and failed to read the most important language—the release language in Section 7. By his own admission, once he received "the answer he wanted" from non-lawyer Merritt, he completely stopped investigating the meaning of the Release, going so far as consciously deciding not to return a lawyer's phone call and executing the Release over thirty (30) days before he had to, because he wanted his severance pay early. Stennett could have ascertained the truth through merely reading the Release himself — let alone returning the second attorney's phone call. An employee simply has not discharged his duty to "learn and know [a release's] contents before he signs and delivers it" by failing to fully read its contents, instead claiming that he was "tricked" by the employer as to its meaning. Stennett knew that the Release could preclude his claim (hence why he tried contacting attorneys), yet he failed to fully read the Release and ascertain the opinion of a lawyer (or even a neutral person). He cannot thus claim mistake.

## III. CONCLUSION

Stennett released all of his claims when he executed the Release and took $28,350.00 in consideration. The Release is fully enforceable under California and federal law, and Stennett failed to meet his burden to prove by a preponderance of the evidence that the Release should be avoided. All evidence regarding this alleged legal misrepresentation is irrelevant under California's parol evidence rule and the fraud and mistake exceptions cannot and do not apply.

While this failure is fatal to his claims, even if he did properly rescind the Release (including tendering back the consideration he received), his claims would still fail because the alleged misrepresentation was made by a non-lawyer, and it was unreasonable as a matter of law for Stennett to have relied on it. Finally, there is simply no evidence of fraudulent intent. Simply making a promise without keeping it is, without more, insufficient as a matter of law to establish intent. In sum, Stennett failed to meet his burden of proving that the Release is unenforceable as to his claims in this Arbitration.

## IV. AWARD

I ORDER that Claimant take nothing by his claims against Respondent. Respondent is not entitled to any fees and/or costs from Claimant. Claimant's substantive claims in this arbitration are barred by the Release he executed in or around April 2016. This Award is in full resolution of all claims submitted to this Arbitration. All claims not expressly granted herein are, hereby, denied. Issues not addressed are found to be moot. Phase II of the Plenary Arbitration addressing classification and damages, if any, is now also moot.

Dated: May 18, 2020

Hon. Steven J. Stone,
Presiding Justice, Court of Appeal (Ret.)
Arbitrator

13

## PROOF OF SERVICE BY E-Mail

Re: Stennett, Donald vs. Halliburton Energy Services Inc
Reference No. 1220058651

I, Monique Childs, not a party to the within action, hereby declare that on  May 18, 2020, I served the attached FINDINGS OF FACT, CONCLUSIONS OF LAW AND AWARD on the parties in the within action by electronic mail at Los Angeles, CALIFORNIA, addressed as follows:

Brian Hefelfinger Esq.
Palay & Hefelfinger, APC
1746 S. Victoria Avenue
Ste 230
Ventura, CA   93003
Phone: (805) 628-8220
bdh@calemploymentcounsel.com
   Parties Represented:
   Donald Stennett

Michael S. Helsley Esq.
Wanger Jones Helsley PC
265 E. River Park Circle
Suite 310
Fresno, CA   93720
Phone: 559-233-4800
mhelsley@wjhattorneys.com
   Parties Represented:
   Halliburton Energy Services, Inc.

Nelita Hatch Esq.
Halliburton
3000 N. Sam Houston Pkwy E.
Houston, TX   77032
Phone: 281-575-3000
nelita.hatch@halliburton.com
   Parties Represented:
   Halliburton Energy Services, Inc.

Annette A. Idalski Esq.
Kyle D. Winnick Esq.
Chamberlain Hrdlicka White, et al.
191 Peachtree St, NE
46th Floor
Atlanta, GA   30303
Phone: 404-659-1410
annette.idalski@chamberlainlaw.com
kyle.winnick@chamberlainlaw.com
   Parties Represented:
   Halliburton Energy Services, Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at Los Angeles, CALIFORNIA on  May 18, 2020.

___/s/ Monique Childs___
Monique Childs
JAMS
MChilds@jamsadr.com

EXHIBIT C

**CHAMBERLAIN HRDLICKA**
 **WHITE WILLIAMS & AUGHTRY**
Annette A. Idalski
Kyle D. Winnick
191 Peachtree Street, NE, 46th Fl.
Atlanta, Georgia 30303-1747
Telephone: (404) 658-5386
Annette.Idalski@chamberlainlaw.com
Kyle.Winnick@chamberlainlaw.com

## JAMS ARBITRATION

| | |
|---|---|
| DONALD STENNETT, | |
| Claimant, | |
| v. | **CASE REFERENCE NO. 1220058651** |
| HALLIBURTON ENERGY SERVICES, INC., a Delaware corporation, | |
| Respondent. | |

## <u>JOINT STIPULATION</u>

Respondent Halliburton Energy Services, Inc. ("Halliburton") and Claimant Donald Stennett ("Stennett") (collectively the "Parties"), by and through their attorneys, stipulate as follows:

1.      On May 18, 2020, the Arbitrator issued a Findings of Fact, Conclusions of Law and Award finding that Halliburton is the prevailing party on all claims asserted by Stennett in this Arbitration (the "Award"), and finding that Halliburton is not entitled to any fees and/or costs from Stennett.  The Award is incorporated herein by this reference.

2.      Each party shall be responsible for his/its own fees and costs.

3.      Each party agrees that there is no ground(s) to vacate the Award.

3524185.v1

4.      Each party will consent to having the Award confirmed by a court of competent jurisdiction.

**SO STIPULATED** this 21st day of July, 2020.

| | |
|---|---|
| **CHAMBERLAIN HRDLICKA**<br>**WHITE WILLIAMS & AUGHTRY** | **PALAY HEFELFINGER, APC** |
| | |
| By:     *s/ Annette A. Idalski* | By:     *s/ Brian D. Hefelfinger* |
|        Annette A. Idalski |        Brian D. Hefelfinger |
|        Kyle D. Winnick |        1746 S. Victoria Ave, Suite 230 |
|        191 Peachtree Street, N.E., 46th floor |        Ventura, CA  93003 |
|        Atlanta, GA  30303-1747 |        Telephone:  (805) 628-8220 |
|        Telephone:  (404) 658-5386 |        Facsimile:  (805) 765-8600 |
|        annette.idalski@chamberlainlaw.com |        Email: dh@calemploymentcounsel.com |
|        kyle.winnick@chamberlainlaw.com | |
| | |
| *Counsel for Respondent Halliburton Energy Services, Inc.* | *Counsel for Claimant Donald Stennett* |

3524185.v1

PROOF OF SERVICE

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067-6055.

On August 19, 2020, I served true copies of the following document(s) described as

**PETITIONER HALLIBURTON ENERGY SERVICES INC.'S CONSENT PETITION TO CONFIRM FINAL ARBITRATION AWARD AND FOR ENTRY OF JUDGMENT**

**CIVIL CASE COVER SHEET**

**NOTICE OF INTERESTED PARTIES**

**PROPOSED ORDER CONFIRMING AWARD**

on the interested parties in this action as follows:

Brian D. Hefelfinger
Palay Hefelfinger, APC
1746 S. Victoria Ave., Suite 230
Ventura, CA  93003

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 19 2020, at Los Angeles, California.

s/Thomas R. Kaufman
Thomas Kaufman

3557285